UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MELVIN WRIGHT,

                              Plaintiff,

                v.

DR. RAO, Health Services Director,
DR. ABBASEY, M.D., and
DR. CARL J. KONIGSMAN,

                          Defendants.
_____

|  |  |
|---|---|
| | REPORT<br>and<br>RECOMMENDATION |
| | 12-CV-00384S(F) |

APPEARANCES:        MELVIN WRIGHT, *Pro Se*
                               08-A-6157
                               Livingston Correctional Facility
                               Box 91
                               Sonyea, New York 14556

                               ERIC T. SCHNEIDERMAN
                               Attorney General, State of New York
                               Attorney for Defendants
                               STEPHANIE JOY CALHOUN
                               Assistant Attorney General, of Counsel
                               Main Place Tower
                               350 Main Street
                               Buffalo, New York  14202

## JURISDICTION

       This case was referred to the undersigned by Honorable William M. Skretny on

January 16, 2014, for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Defendants' motion for summary judgment (Doc. No. 17), filed November 13, 2013.

## BACKGROUND

Plaintiff Melvin Wright ("Plaintiff"), commenced this civil rights action on May 1, 2012, alleging Defendants, all employees of New York State Department of Corrections and Community Supervision ("DOCCS"), violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by failing to treat and denying Plaintiff adequate treatment for chronic back, arm, and shoulder pain while Plaintiff was housed in Attica Correctional Facility ("Attica" or "the correctional facility").  Defendants to this action include DOCCS Medical Director Jadrow Rao, M.D. ("Dr. Rao"), Attica physician Sallah Abbasey, M.D. ("Dr. Abbasey"), and DOCCS Deputy Commissioner and Chief Medical Officer Carl Koenigsmann, M.D. ("Dr. Koenigsmann").[1]  Plaintiff asserts two claims for relief including that between March 2011 and March 2012, Defendants denied Plaintiff adequate medical care and were deliberately indifferent to Plaintiff's serious medical needs by acting with negligence and committing medical malpractice by showing deliberate indifference to Plaintiff's complaints of severe pain and refusing to properly examine Plaintiff and diagnose the cause of his physical complaints, insisting instead that Plaintiff was attempting to obtain narcotic pain medications.  On October 5, 2012, Defendants filed their answer (Doc. No. 9).

On November 13, 2013, Defendants filed the instant motion seeking summary judgment (Doc. No. 17) ("Defendants' motion"), attaching in support Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Doc. No. 17-1) ("Defendants' Memorandum"), the Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment (Doc. No. 17-2) ("Defendants' Statement of Facts"), the Declaration of Dr. Abbasey in Support of Defendants' Motion for Summary

---

[1] Dr. Koenigsmann's name is misspelled in the Complaint as "Konigsman."

2

Judgment (Doc. No. 17-3) ("Dr. Abbasey Declaration"), the Declaration of Dr.

Koenigsmann in Support of Defendants' Motion for Summary Judgment (Doc. No. 17-4)

("Dr. Koenigsmann Declaration"), and the Declaration of Dr. Rao in Support of

Defendants' Motion for Summary Judgment (Doc. No. 17-5) ("Dr. Rao Declaration").  On

February 10, 2014, Plaintiff filed Plaintiff's Memorandum of Law in Opposition to

Defendants' Motion for Summary Judgment (Doc. No. 22) ("Plaintiff's Response"),

attaching various medical records as an exhibit ("Plaintiff's Response Exh(s). at __"),[2]

the Affidavit of Plaintiff in Support of Opposition of [sic] Defendant's [sic] Motion for

Summary Judgment Response to Declaration (Doc. No. 23) ("Plaintiff's Affidavit"),

attaching as exhibit A various medical records ("Plaintiff's Affidavit Exh. A at __"),[3] and

the Statement of Undisputed Facts in Opposition to Defendant's [sic] Motion for

Summary Judgment (Doc. No. 24) ("Plaintiff's Statement of Facts").  Oral argument was

deemed unnecessary.

Based on the following, Defendants' motion should be GRANTED in part and

DENIED in part.


## FACTS[4]

Plaintiff Melvin Wright ("Plaintiff" or "Wright"), while incarcerated at Attica

Correctional Facility ("Attica" or "the correctional facility") between March 2011 and

March 2012, was treated on numerous occasions for complaints of back pain by various

members of Attica's medical staff including Defendants Dr. Rao and Dr. Abbasey.  At all

---

[2] Because the exhibits attached to Plaintiff's Response are not separately denominated, in the interest of clarity, the court refers to the specific page number of the electronically filed Plaintiff's Response.
[3] References to "Plaintiff's Affidavit Exh. A at __" are to the specific page number of the electronically filed Plaintiff's Affidavit Exh. A.
[4] Taken from the pleadings and motion papers filed in this action.

times relevant to this action, Dr. Koenigsmann was DOCCS Chief Medical Officer in

Albany, New York.  Plaintiff has a long history of chronic back pain, shoulder pain and

other pain complaints beginning prior to Plaintiff's incarceration at Attica in March 2012.

In particular, Plaintiff's medical record indicates that more than ten years ago,

Plaintiff underwent surgery for osteomyelitis (infectious, painful inflammatory disease of

the bone) of his left ankle. (R. 163).[5]  A July 10, 2002 MRI of Plaintiff's lumbar spine

showed a small right paracentral disc herniation at L4-L5 with possible compromise of

the right L5 nerve root.  (R. 432).  An October 21, 2002 MRI of Plaintiff's left shoulder

showed a severe degree of subacromial impingement and mild supraspinatus

tendonopathy (inflammation of rotator cuff tendon, often associated with shoulder

impingement syndrome).  Plaintiff's Response Exh. at 17.[6]  A February 12, 2004 x-ray

showed degenerative joint disease in Plaintiff's acromial joint (attaching the shoulder to

the clavicle) and glenohumeral articulation (shoulder joint) with no signs of acute

abnormalities.  (R. 431).  An October 21, 2002 MRI of Plaintiff's left shoulder indicated

severe subacromial impingement, and mild supraspinatus tendonopathy without

evidence of full thickness rotator cuff tear.  (R. 429).  Plaintiff's has had a history of

Hepatitis C since 2004.  (R. 163).  Surgical spinal films taken March 6, 2007 showed

degenerative changes of the vertebrae at C4–C5 and C5–C6.  (R. 327).  Plaintiff also

has a long history of being prescribed Ultram (narcotic analgesic) for his pain

management.

On March 17, 2011, Plaintiff was seen in Attica's sick call with complaints of

trigger pain in his thumb, neck pain, and a burning sensation in his left wrist without

---

[5] "R" references are to the Bates-stamped pages of Plaintiff's medical record, various pages of which are filed as Dr. Abbasey Declaration Exh. A, and Dr. Rao Declaration Exh. A.
[6] References to "Plaintiff's Response Exh. at __" are to the specific page of Plaintiff's Response Exhibit.

swelling. (R. 168).  On April 1, 2011, Plaintiff, complaining of bilateral swelling and of his

arms and pain, reported to Attica's sick call where his arms appeared swollen and

tender.  (R. 167).  Later that day, Plaintiff was examined by Physician Assistant

Deborah Graf ("PA Graf"), who observed bilateral mild swelling of Plaintiff's elbows, no

deformity, and bilateral decrease range of shoulder motion.  (R. 167).  Plaintiff was

prescribed Ultram and Neurontin (nerve pain medication).

    X-rays of Plaintiff's elbows taken April 6, 2011 showed a normal right elbow and,

as to the left elbow, "elliptical radiopaque [blocking the passage of x-rays][7] density in the

soft tissue anterior to the proximal end of the radius.  This could represent a bony

fragment vs. a radiopaque foreign body."  Plaintiff's Response Exh. at 18.  An x-ray of

Plaintiff's cervical spine taken on April 6, 2011 showed "disc space narrowing at the C4-

5 and C5-6 with hypertrophic changes of their opposing borders.  This is most probably

the basis of either disc degeneration or herniation."  *Id.*  Arthritic changes invlving the

uncovertebral joints (joints lasted in the cervical region of the vertebral column between

C3 and C7).  *Id.*

    On April 12, 2011, Plaintiff was examined by PA Graf who ordered new lab-work

pertaining to Plaintiff's Hepatits C diagnosis.  (R. 167).  When Plaintiff requested Ultram

and Neurontin be renewed for back pain, Dr. Rao was called in to examine Plaintiff,

finding Plaintiff's lumbar spine and gait were normal, Plaintiff was able to touch his toes,

and no neurological deficits were noted.  (R. 166).  Dr. Rao refused to renew Ultram and

Neurontin, offering instead Ibuprofen and Flexeril, both of which Plaintiff declined, and

Plaintiff was referred to neurosurgery for cervical pain.  (R. 166).  Plaintiff maintains he

declined the offered medications because he had previously used Ibuprofen and Flexeril

---

[7] Unless otherwise indicated, all bracketed material has been added.

and they no longer alleviated his pain.  Plaintiff's Affidavit ¶ 7.  Plaintiff was diagnosed with moderate to severe degenerative disc disease in his neck, and Hepatitis C for which new tests were ordered.  (R. 166).

Plaintiff was next examined in sick call on May 12, 2011, by PA Graf for complaints of bilateral shoulder, right leg, and back pain, which Plaintiff attributed to the discontinuance of Ultram and Neurontin.  (R. 164); Plaintiff's Response Exh. at 21.  PA Graf reported Plaintiff was angry and felt it unfair that other prison inmates were given pain medications that Plaintiff was not allowed to have.  *Id.*  Plaintiff requested copies of his medical records and requested to speak with Dr. Rao.  *Id.*  PA Graf advised Plaintiff that neurosurgical and orthotic consultations had been denied, but that a request to see Dr. Rao would be made.  *Id.*

On May 26, 2011, Plaintiff wrote to then DOCCS Chief Medical Officer Dr. Lester Wright ("Dr. Wright")[8] ("Plaintiff's First Letter"),[9] requesting Dr. Wright's assistance in obtaining proper medical treatment for Plaintiff's chronic pain and complaining that Attica's medical staff remained focused only on Plaintiff's requests for renewal of his previous medications, *i.e.*, Ultram and Neurontin, and ignored Plaintiff's complaints of severe pain.  Plaintiff's Affidavit ¶ 11 and Plaintiff's First Letter at 17.  Plaintiff told Dr. Wright that he had been advised by that the only remedy to his pain and suffering was either medication or surgery, but that surgery would be only a temporary solution and "it would really not be worth it in the long run,"[10] so Plaintiff decided medication was his best option.  *Id.*  Plaintiff also stated that prior to entering Attica, he had been taking Ultram and Neurontin for two years which allowed Plaintiff to function normally, but that

---

[8] Dr. Wright was succeeded by Dr. Koenigsmann.
[9] Filed as Plaintiff's Affidavit Exh. A at 17-18.
[10] Plaintiff does not identify who gave him this advice.

he was told by Attica's medical staff that Plaintiff's Ultram and Neurontin were being discontinued according to Attica's own rule prohibiting such medications, and that Plaintiff did not appear to have any medical problems, but that his medical record would be reviewed to assess Plaintiff's condition. *Id.* at 17-18. Plaintiff further advised that without his previous medications, his pain was so severe that Plaintiff left his cell only to eat and to attend his Alternative to Violence program at which Plaintiff endured his back and neck pain only because Plaintiff "need[ed] this program." *Id.* at 18. When no response to Plaintiff's First Letter was received, Plaintiff again wrote to Dr. Wright ("Plaintiff's Second Letter"),[11] stating that other prison inmates with less serious conditions were receiving the same medications Plaintiff has been denied in violation of Attica's policy that Ultram and Neurontin not be used by inmates. Plaintiff's Second Letter.

On June 16, 2011, Plaintiff complained of continuing pain with noise in his neck and upper extremities, and had experienced a stinging sensation in his left arm with numbness in his left wrist and hand for the past month. (R. 164); Plaintiff's Response Exh. 21. Dr. Rao examined Plaintiff in sick call on June 22, 2011, when Plaintiff complained of "total body pain," neck pain, and low back pain. (R. 163). Dr. Rao reported an x-day of Plaintiff's left elbow showed a radiopaque density at the proximate end of the radius which may be a bony fragment. (R. 163). Plaintiff was alert, with no distress and ambulated freely, but when asked to touch his toes, Plaintiff told Dr. Rao, "You are going to make my pain worse," and Dr. Rao was unable to complete the examination. (R. 163). Plaintiff requested a renewal of Neurontin, but Dr. Rao

---

[11] Filed as Plaintiff's Affidavit Exh. A at 19. Although Plaintiff's Second Letter is not dated, Plaintiff maintains it was written two weeks after Plaintiff's First Letter. Plaintiff's Second Letter.

observed Plaintiff had a history of Hepatitis C and of IV drug use and offered to prescribe Motrin, which Plaintiff refused stating, "I will write to Albany," before walking out.  (R. 163).  Dr. Rao did not again treat Plaintiff.

On July 12, 2011, Plaintiff filed a grievance regarding his requests for treatment of his pain and medical issues.  Plaintiff's Response Exh. at 23.  Plaintiff maintains he had not been examined but only told he could not have his previous medications renewed.  Id.  Plaintiff requested a medical examination and treatment of his severe pain and medical problems.  Id.  Plaintiff's grievance was denied based on Dr. Rao's explanation that Plaintiff's history of drug abuse and liver problems rendered it unsafe to prescribe Plaintiff strong pain medications or narcotics.  Id. at 24.

On July 18, 2011, Plaintiff presented to sick call with complaints of left arm pain with occasional swelling and gastrointestinal issues, and worries that his rectal prolapse had reoccurred.  (R. 162).  Tylenol was prescribed for the arm pain to be "taken sparingly" and no more than four times a day because of Plaintiff's Hepatitis C history, and Metamucil for his gastrointestinal concerns.  (R. 162).  Plaintiff was seen in sick call in July 26, 2011, again complaining of left arm pain and swelling and gastrointestinal problems, and Plaintiff was scheduled to be evaluated by a medical doctor.  (R. 162).

By letter to DOCCS Regional Health Services Administrator Eileen Dinisio ("Dinisio"), dated August 29, 2011, Plaintiff complained about the difficulties he encountered trying to get Attica's medical staff to provide "some kind of medical treatment for my physical medical concerns."  Plaintiff's Response Exh. at 25.  Plaintiff explained that despite having "continuously attended sick call," and seeing a medical provider on several occasions, every time Plaintiff mentioned his severe pain,

"immediately the focus of the clinician becomes stuck on the idea that I'm simply trying to get pain medication simply as a means to get high, and from that point on there is nothing else done to address or investigate the cause of these symptoms." *Id*.  Plaintiff stated the pain was not normal, but unusual, and Plaintiff was "very afraid" that by the time his medical condition was taken seriously, Plaintiff's condition would be either irreversible or untreatable and may cause damage of a debilitating nature.  *Id*. According to Plaintiff, "[s]omething is wrong other than simple arthritis!"  *Id*.

According to an undated entry in Plaintiff's medical record, between July 26, 2011 and September 12, 2011, Plaintiff was examined by Dr. Khalil for complaints of left arm, leg, and neck pain.  (R. 162).  Dr. Khalil noted Plaintiff was status post elbow fracture with median nerve compression and had degenerative disc disease at C4 – C5, and C5 – C6.  (R. 162).  Upon examination, Dr. Khalil found Plaintiff was stable and Dr. Khalil prescribed Ibuprofen to be taken with food twice a day, and directed Plaintiff to follow-up as needed.  (R. 162).

On September 29, 2011, Plaintiff was seen  by Dr. Evans in sick call with complaints of back pain, "bad headaches," and left wrist pain.  (R. 161).  Plaintiff complained that his prescription for Baclofen (muscle relaxant) had been discontinued. (R. 161).

By letter to New York State Attorney General dated November 16, 2011 ("Nov. 16, 2011 Letter"),[12] Plaintiff stated he was "at my wits end trying to get the medical staff" at Attica to help Plaintiff address his medical concerns to no avail save for the taking of a few x-rays.  According to Plaintiff, "[i]t has been told to me that I'm just trying to get drugs, and so everyone I have seen has been outright indifferent to my complaints."  *Id*.

---

[12] Filed as Plaintiff's Response Exh. at 28.

Plaintiff continued that he had "constantly stressed" he was kept awake every night by "a great deal of pain" and that he had informed the doctors he did not want pain medication, "but to please do something to find out what's causing me so much pain so that they can treat it, but I have received nothing but blatant indifference." *Id.*

Also on November 16, 2011, Plaintiff wrote to New York Inspector General Richard D. Roy ("Roy") ("November 16, 2011 Letter"),[13] complaining he was writing "as a last resort" given that Plaintiff's letters to DOCCS Commissioner and Chief Medical Officer had been "to no avail." November 16, 2011 Letter. Plaintiff explained he had been trying to obtain proper medical treatment from Attica's medical staff for six to seven months, only to be met with "the run-around and indifference to the medical problems" Plaintiff continually brought to their attention and had even pursued a grievance, all without any results. *Id.* Plaintiff stressed that "[t]he doctors here will not take my complaints seriously," and assume Plaintiff is pursuing an ulterior motive to obtain certain prescription medications despite Plaintiff's advising the doctors they do not have to prescribe any medication, but Plaintiff wanted the doctors to do something to determine the cause of his pain so that he could receive proper treatment. *Id.*

On December 5, 2011, Plaintiff was examined at sick call by Dr. Abbasey for chronic neck pain without radiculopathy. (R. 159). Dr. Abbasey noted Plaintiff's cervical spine x-ray of April 6, 2011 showed hypertrophic changes at C4 – C5, and C5 – C6. (R. 159). Plaintiff again requested Neurontin and Ultram, expressed anger that his prescriptions for the drugs had been discontinued, stated he had "already the proceedings to sue," and "walked out unhappy." (R. 159). On December 28, 2011, Plaintiff was seen by PA Graf in follow-up to Plaintiff's Hepatitis C diagnosis. (R. 159).

---

[13] Filed as Plaintiff's Response Exh. at 30.

Plaintiff's lab results were reviewed, but Plaintiff continued to refuse treatment for Hepatitis C.  (R. 159).

In a Memorandum to Plaintiff dated February 21, 2012 ("February 21, 2012 Memorandum"),[14] Attica Deputy Superintendent for Administration Michelle A. Artus ("Artus"), Artus advised that she had been forwarded a recent letter from Plaintiff to the Legal Aid Society for a response.  February 21, 2012 Memorandum.  Artus stated that Attica's medical staff indicated Plaintiff was last seen at sick call on December 28, 2011, that Plaintiff had a history of Hepatitis C but was refusing treatment, that Plaintiff was prescribed Motrin for pain but had refused it, insisting he be given Ultram for which his request was denied, and that Plaintiff was scheduled for a follow-up appointment the following week.  *Id.*  Plaintiff responded to the February 21, 2012 Memorandum by letter to Artus dated February 21, 2012 ("February 21, 2012 Letter"),[15] complaining that his medical records contains several errors including that he was never seen at Attica's sick call on December 28, 2011, and that Plaintiff never refused Motrin nor insisted he be given Ultram.  February 21, 2012 Letter.  Plaintiff explained that such falsehoods in his medical records were routinely used by Attica's medical staff to cover for the failure to order appropriate medical tests to diagnose the source of Plaintiff's chronic pain, demonstrating "a callous indifference" to Plaintiff's medical needs.  *Id.*  Plaintiff again stated he was not concerned about pain medication, but wanted to learn the cause of his "abnormal" pain, yet had never had a thorough examination by Attica's medical staff in regard to his complaints, nor have further x-rays been ordered.  *Id.*  Plaintiff also stated he had been advised that his Hepatitis C is not serious and does not presently

---

[14] Filed as Plaintiff's Response Exh. at 35.
[15] Filed as Plaintiff's Response Exh. at 34.

require treatment.  *Id.*  By letter dated March 2, 2012 ("March 2, 2012 Letter"),[16] Artus replied to the February 21, 2012 Letter stating that a review of Plaintiff's medical records indicated Ultram was discontinued in May 2011, Plaintiff was examined by Dr. Rao in June 2011, and by Dr. Abbasey in December 2011, and that Plaintiff expressed his displeasure with both physicians.  March 2, 2012 Letter.  According to Artus, Plaintiff's medical records also showed Plaintiff was offered, but refused, Motrin, and that on December 28, 2011, PA Graf reviewed Plaintiff's lab work, yet Plaintiff continued to refuse treatment for the Hepatitis C with which he was diagnosed in 2005.  *Id.*  Artus concluded, "At his juncture, it appears that your medical care is appropriate."  *Id.*  Plaintiff responded by letter to Artus dated March 5, 2012 ("March 5, 2012 Letter"),[17] clamoring to have his medical complaints taken seriously and reiterating that the continuing focus on Plaintiff's medication was erroneous because all Plaintiff was seeking was "to get to the heart of" his medical problems rather than "cover up" the symptoms with medication.  March 5, 2012 Letter.  According to Plaintiff, neither Dr. Rao nor Dr. Abbasey had ever examined Plaintiff but have only talked to him and were basing their diagnosis on "basic x-rays" to which there had been no follow-up.  *Id.*  Plaintiff further described his medical complaints as severe pain in both shoulders that prevented Plaintiff from laying on either side to sleep, a "constant burning sensation" in his left arm running to his hand, shooting pains to the back of the his skull causing severe headaches, and constant stomach pain.  *Id.*  Plaintiff repeated that his Hepatitis C was not presently a real concern and he was only requesting appropriate steps be taken to address his medical concerns.  *Id.*

---

[16] Filed as Plaintiff's Response Exh. at 36.
[17] Filed as Plaintiff's Response Exh. at 37.

On March 9, 2012, Plaintiff was examined by Dr. Abbasey for complaints of bilateral shoulder, neck, and low-back pain.  (R. 158).  Dr. Abbasey noted Plaintiff's history of rotator cuff surgery on both shoulders, and that Plaintiff was not then taking any medications.  (R. 158).  Dr. Abbasey noted Plaintiff was argumentative and tried to help Plaintiff understand his neck situation with hypertrophic changes and pinched nerve, offering to prescribe Plaintiff a non-steroidal, anti-inflammatory medication for his pain, but Plaintiff walked out, saying he "will sue."  (R. 158).

On May 25, 2012, Plaintiff was transferred from Attica to Livingston Correctional Facility ("Livingston"), where Plaintiff continued to complain of, and received treatment for, pain and weakness in his upper extremities and neck.  In particular, Plaintiff maintains that shortly after his arrival at Livingston he was again prescribed Ultram and Neurontin.  Plaintiff's Memorandum at 8; Plaintiff's Statement of Facts ¶ 25.

On November 20, 2012, Marcia Fries, M.D. ("Dr. Fries"), referred Plaintiff for an MRI of his cervical spine.  Plaintiff's Response Exh. at 41.  Dr. Fries's stated reasons for the MRI were Plaintiff's complaints of severe neck pain, his April 6, 2011 x-ray showed disc space narrowing of C4 - C5 and C5 - C6 consistent with herniation and disc disease, Plaintiff's left arm was weak upon examination, he had numbness in his left hand, and Dr. Fries was "very concerned for nerve impingement."  *Id.*  Plaintiff's cervical spine MRI, taken on December 13, 2012, showed "[d]isc pathology from the C2 – C3 to the C6 – C7 level with central stenosis and foraminal narrowing multiple levels including but not limited to the C4 – C5 level."  Plaintiff's Affidavit Exh. A at 20.  The disc pathology included disc protrusion, bulge, and herniation.  *Id.*

Upon examination by Gregory Bennett, M.D. ("Dr. Bennett"), on January 2, 2013, Plaintiff reported left upper extremity weakness and pain, his December 13, 2012 MRI of the cervical spine showed multi-level stenosis with disc bulges, and a consultation with a spine specialist was requested.  Plaintiff's Response Exh. at 42.  Dr. Bennett opined that conservative management and pain medications were failing.  *Id.*

On April 5, 2013, Plaintiff underwent a nerve conduction velocity study of his left arm, the findings of which were "indicative of bilateral carpal tunnel syndrome of moderate severity by electrodiagnostic criteria.  In addition, there is a bilateral cubital tunnel syndrome of a moderate-to-severe degree.  No evidence for radiculopathy was seen."  Plaintiff's Affidavit Exh. A at 21.  Plaintiff was scheduled for routine follow-up.  *Id.*

On July 29, 2013, Plaintiff was examined by an unidentified orthopedic specialist who determined Plaintiff's nerve damage in his arms was caused by the degenerating discs in Plaintiff's cervical spine, and recommended Plaintiff undergo surgery for left carpal tunnel release and ulnar nerve release.  Plaintiff's Affidavit ¶ 17 and Exh. A at 22-23.  On August 22, 2013, Plaintiff underwent the recommended surgeries.  Plaintiff's Affidavit ¶ 18 and Exh. A at 24; Plaintiff's Response Exh. at 46.  After his surgery, Plaintiff was prescribed Percocet, containing the narcotic oxycodone, for pain for five days.  Plaintiff's Response Exh. at 46. Plaintiff maintains he has been advised further surgery has been recommended to remove a disc in his neck which would fully alleviate his pain, Plaintiff's Affidavit ¶ 18, and that had Plaintiff had the surgery while housed at Attica, he would have avoided much pain.  *Id.* ¶ 19.

## DISCUSSION

1.      **Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party

demonstrates that there are no genuine issues as to any material fact and that a moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.

2003).  The court is required to construe the evidence in the light most favorable to the

non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party

moving for summary judgment bears the burden of establishing the nonexistence of any

genuine issue of material fact and if there is any evidence in the record based upon any

source from which a reasonable inference in the non-moving party's favor may be

drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322;

*see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a

material fact is "genuine," that is, if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party").  "A fact is material if it 'might affect the

outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35

(2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide

district courts in their determination of summary judgment motions."  *Brady v. Town of*

*Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary

judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit

a reasonable juror to return a verdict in his or her favor on'" an essential element of a

claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec.*

*Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).   Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).   "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

        In the instant case, Plaintiff asserts civil rights violations under 42 U.S.C. § 1983. Section 1983, "allows an action against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'"  *Patterson v. County of Oneida*, N.Y., 375 F.3d 206, 225 (2d Cir. 2004) (quoting 42 U.S.C. § 1983).  Insofar as Defendants are alleged to have violated Plaintiff's civil rights, pursuant to 42 U.S.C. § 1983, an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States.  42 U.S.C. § 1983.  Section 1983 "allows an action against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'"  *Patterson v. County of Oneida, N.Y.*, 375 F.3d

206, 225 (2d Cir. 2004) (quoting 42 U.S.C. § 1983).  Section 1983, however, "'is not itself a source of substantive rights.'"  *Patterson*, 375 F.3d at 225 (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred'. . . ." *Id.*  The elements of a § 1983 claim include (1) the deprivation of a federal constitutional or statutory right, and (2) by a person acting under color of state law.  *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (citing *Gomez v. Taylor*, 466 U.S. 635, 640 (1980)).  Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989); and *Baker*, 443 U.S. at 140).

Here, Plaintiff alleges Defendants denied him adequate medical care in violation of his Eighth Amendment rights.  Further, it is undisputed that Defendants were acting under color of state law in connection with the alleged constitutional violations, thus satisfying the second element.  As such, the issues before the court on Defendants' summary judgment motion are limited to whether a reasonable juror could find any such actions violated Plaintiff's constitutional rights as alleged, and whether Defendants are qualifiedly immune from liability on Plaintiffs' claims.

Defendants argue in support of summary judgment the record establishes Defendants did not fail to provide Plaintiff with adequate medical care, Defendants' Memorandum at 4-10, and that the claims must be dismissed as against Dr. Koenigsmann who, as a supervisory defendant, was not sufficiently involved in Plaintiff's medical care at Attica to be held liable under § 1983.  *Id.* at 10-14. Alternatively, Defendants argue they are entitled to qualified immunity, *id.* at 15, or

Eleventh Amendment immunity insofar as Plaintiff asserts claims against Defendants in their official capacities.  *Id.* at 15-16.

In opposition to summary judgment, Plaintiff argues Dr. Abbasey and Dr. Rao never actually treated Plaintiff other than to offer the non-steroidal anti-inflammatory medication Ibuprofen, even though Ibuprofen is also not recommended for those with liver disease, and shortly after Plaintiff's transfer to Livingston, Plaintiff was again prescribed Ultram and Neurontin.  Plaintiff's Response at 7-9.  Plaintiff further argues that summary judgment should not be granted as to Dr. Koenigsmann because although Dr. Koenigsmann did not directly participate in denying Plaintiff adequate medical treatment, the record establishes Dr. Koenigamann acquiesced in such alleged constitutional violation.  *Id.* at 9-12.  Plaintiff also maintains no Defendant is qualifiedly immune from liability in this action because Plaintiff's Eighth Amendment right to adequate medical treatment was clearly established at the time of the alleged constitutional violations.  *Id.* at 12-15.  Defendants did not file any reply in further support of summary judgment.


**2.      Eleventh Amendment Immunity**

Preliminarily, the court addresses Defendants' argument, Defendants' Memorandum at 15-16, that Eleventh Amendment immunity bars the § 1983 claims against Defendants in their official capacities.  It is settled that insofar as Defendants are sued in their official capacities as state employees, such action is against the State such that Defendants enjoy immunity under the Eleventh Amendment on such claims. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent

that a state official is sued for damages in his official capacity, such a suit is deemed to

be a suit against the state, and the official is entitled to invoke the Eleventh Amendment

immunity belonging to the state.").  As such, summary judgment should be GRANTED

as to all Defendants insofar as they are sued in their official capacity.


**3.      *Respondeat Superior***

With regard to the claims against Dr. Koenigsmann, Defendants maintain such

claims should be dismissed for lack of personal involvement insofar as Dr.

Koenigsmann was not directly involved in Plaintiff's medical care, and fulfilled his

obligation, as DOCCS Chief Medical Officer, of ensuring Plaintiff's complaints were

assigned to a staff member for investigation, which investigation showed Plaintiff had

received appropriate medical treatment for his complaints.  Defendants' Memorandum

at 11-14.  Plaintiff does not dispute this assertion, Plaintiff's Response at 10, yet

maintains the record establishes Dr. Koenigsmann was aware of and consented to the

allegedly unconstitutional inadequate treatment of which Plaintiff complains, thereby

subjecting Dr. Koenigsmann to liability.  *Id.* at 10-12.

"[S]upervisor liability in a § 1983 action depends on a showing of some personal

responsibility, and cannot rest on *respondeat superior.*"  *Hernandez v. Keane*, 341 F.3d

137, 144 (2d Cir. 2003) (citing *Al-Jundi v. Estate of Rockfeller*, 885 F.2d 1060, 1065 (2d

Cir. 1989)).  "Similarly, proof of 'linkage in the prison chain of command' is insufficient."

*Id.* (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)).  "'Absent some personal

involvement by [the supervisory official] in the allegedly unlawful conduct of his

subordinates,' he cannot be liable under section 1983.'"  *Id.* at 144-45 (quoting *Gill v.*

*Mooney*, 824 F.2d 192, 196 (2d Cir. 1987)).  Even an imperfect investigation, without

more, does not give rise to a constitutional violation.  *Friedman v. New York City Admin.*

*for Children's Services*, 502 Fed.Appx. 23, 27 (2d Cir. Nov. 6, 2012) (citing *Wilkinson v.*

*Russell*, 182 F.3d 89, 106 (2d Cir. 1999)).

Supervisory liability under § 1983

can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez*, 341 F.3d at 145 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

In the instant case, Plaintiff has made no such showing as to Dr. Koenigsmann.  In

particular, it is undisputed that Dr. Koenigsmann was never personally involved in

examining, diagnosing, or treating Plaintiff.  Nor is there any evidence Dr. Koenigsmann

was in receipt of any report informing him of a wrong by the investigating staff members

which Dr. Koenigsmann failed to remedy.  There is also no evidence Dr. Koenigsmann

created any policy or custom sanctioning any unconstitutional conduct by Defendants,

or was grossly negligent in supervising his staff members responsible for investigating

Plaintiff's complaints.   Moreover, there is no allegation that any of Dr. Koenigsmann's

subordinates who participated in the investigation of Plaintiff's letters of complaint

violated Plaintiff's constitutional rights.  Significantly, a supervisor cannot be deliberately

indifferent to an inmate's serious medical needs "if no single subordinate committed an

act amounting to a constitutional violation."  *Hernandez*, 341 F.3d at 145.  In the

absence of any allegation, much less any evidence, that any member of Dr.

Koenigsmann's staff responsible for investigating Plaintiff's complaints acted with deliberate indifference to Plaintiff's serious medical needs, Dr. Koenigsmann cannot be held liable on a supervisory basis for any constitutional violations.

Summary judgment should be GRANTED as to Dr. Koenigsmann.

**4.     Eighth Amendment Inadequate Treatment Claims**

To substantiate an Eighth Amendment claim for medical indifference, an inmate plaintiff must prove the defendants were deliberately indifferent to a serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994).  A deliberate indifference claim has both objective and subjective elements. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  "Objectively, the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal citation and quotation marks omitted).  "Subjectively, the official charged . . . must act with a sufficiently culpable state of mind." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citation and internal quotation marks omitted).  Where the inmate plaintiff alleges defendants failed to provide any treatment for a medical condition, "courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).  Further, "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).  Where, however, as here, the challenge is to the adequacy of the treatment provided, such as in cases where treatment is alleged to have been delayed or interrupted, the seriousness inquiry focuses on "the particular risk

of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, not considered in the abstract." *Smith*, 316 F.3d at 186.

In the instant case, it is without question that Plaintiff's medical condition was sufficiently serious in that Plaintiff's degenerative disc disease in his cervical spine and carpal tunnel and ulnar nerve entrapment, left untreated, would result in degeneration and extreme pain as is evident from the further medical tests Plaintiff underwent after being transferred to Livingston, including the MRI and nerve conduction studies showing extensive degenerative disc disease in Plaintiff's cervical spine from C2 – C3 to C6 – C7, and bilateral carpal tunnel and ulnar nerve entrapment.  The later tests establish either that Plaintiff's condition while incarcerated at Attica was more serious than revealed by the April 6, 2011 x-ray, the only diagnostic test which Plaintiff was given while incarcerated at Attica, or was exacerbated by the denial of adequate treatment, and Defendants do not argue otherwise.  Plaintiff also maintains, Plaintiff's Memorandum at 8; Plaintiff's Statement of Facts ¶ 25, and Defendants do not dispute, that Plaintiff was again prescribed Ultram and Neurontin shortly after being transferred to Livingston.  The objective prong of Plaintiff's deliberate indifference claim is thus satisfied and, accordingly, the only question before the court on summary judgment is the subjective prong, *i.e.*, whether there is a material issue of fact as to whether Defendants acted with a sufficiently culpable state of mind.

A person acts with deliberate indifference to an inmate's health or safety only if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exits, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836. It is the equivalent of recklessly disregarding a substantial risk of serious harm to the inmate. *Id.* An inmate is not required to show that the official acted or failed to act believing that harm actually would befall an inmate; it is sufficient that the official acted or failed to act despite the official's knowledge of a substantial risk of serious harm. *Id.* at 837. Supreme Court "'cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment.'" *Id.* at 838 (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)). "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [Supreme Court] cases be condemned as the infliction of punishment." *Id.* "The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or *so obvious that it should be known.*" *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (italics added) (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 34, pp. 213-14 (5th ed. 1984); Restatement (Second) of Torts § 500 (1965)).

"In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). "Deliberate indifference is a mental state equivalent to subjective recklessness . . . . This mental state requires that the charged official act or fail to act while actually aware of a

substantial risk that serious inmate harm will result." *Id.* (internal citation omitted). Nevertheless, "[t]he defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk or serious harm) need not be sound so long as it is sincere." *Id.* at 281. Here, several unresolved issues of fact, if decided in Plaintiff's favor, could establish the requisite subjectively culpable state of mind to hold either Dr. Abbassey or Dr. Rao liable for denying Plaintiff adequate medical care.

In particular, Defendants' repeated denial of Ultram and Neurontin to treat Plaintiff's extreme pain is questionable insofar as Plaintiff maintains Ultram and Neurontin were the only medications that worked to alleviate his pain. Defendants' assertion that Ultram and Neurontin were discontinued because of Plaintiff's positive test for Hepatitis C is inconsistent with the facts that although Plaintiff was initially diagnosed with Hepatits C in 2002, he was receiving Ultram and Neurontin until March 2011 when he was transferred to Attica, the medications were again prescribed after Plaintiff was transferred from Attica to Livingston in May 2012, and Defendants' repeated offers to prescribe Plaintiff Ibuprofen despite the fact that Ibuprofen is not recommended for those with liver disease like Plaintiff's Hepatitis C. The record also establishes that after Plaintiff's left carpal tunnel release and ulnar nerve release carpal tunnel surgeries, he was prescribed pain medication containing the narcotic oxycodone. Further, such facts, undisputed by Defendants, are consistent with Plaintiff's assertions that despite testing positive for Hepatitis C, his condition was not then serious, neither requiring treatment nor rendering the medications inappropriate. Nor have Defendants disputed that Ultram and Neurontin are appropriate medications for the type of pain of

which Plaintiff complained, or that Plaintiff's physical impairments were likely to cause extreme pain consistent with Plaintiff's complaints.

With regard to the denial of further diagnostic tests, that on November 20, 2012, after Plaintiff transferred to Livingston, Dr. Fries, based on Plaintiff's complaints of severe neck pain and the April 6, 2011 x-ray showing disc space narrowing of C4 - C5 and C5 - C6 consistent with herniation and disc disease, left arm weakness, and numbness in his left hand, was "very concerned for nerve impingement," and ordered an MRI of Plaintiff's cervical spine.  Plaintiff's Response Exh. at 41 (underlining added). Based on the results of the MRI, taken on December 13, 2012, showing "[d]isc pathology from the C2 – C3 to the C6 – C7 level with central stenosis and foraminal narrowing multiple levels including but not limited to the C4 – C5 level," with disc protrusion, bulge, and herniation, Plaintiff's Affidavit Exh. A at 20, Dr. Bennett, upon examining Plaintiff on January 2, 2013, opined that conservative management of Plaintiff's condition and pain medications were failing, and a consultation with a spine specialist was requested. Plaintiff's Response Exh. at 42.  Plaintiff underwent further diagnostic testing, including a nerve conduction velocity study of his left arm, the findings of which were indicative of bilateral carpal tunnel syndrome of moderate severity and bilateral cubital tunnel syndrome of a moderate to severe degree. Plaintiff's Affidavit Exh. A at 21.  On July 29, 2013, Plaintiff was finally examined by an unidentified orthopedic specialist who determined Plaintiff's nerve damage in his arms was caused by the degenerative discs in Plaintiff's cervical spine, and recommended surgery which Plaintiff underwent on August 22, 2013 for left carpal tunnel release and ulnar nerve release, which was successful.  Plaintiff's Response Exh. at 46; Plaintiff's

Affidavit ¶¶ 17-19 and Exh. A at 22-24.   Nevertheless, Plaintiff needs more surgery to completely alleviate his severe pain.

Dr. Fries's reaction based solely on the April 6, 2011 x-ray and Plaintiff's subjective complaints of pain, that she was "very concerned for nerve impingement," Plaintiff's Response Exh. at 41, strongly suggests Defendants were wilfully ignorant of the risk Plaintiff's degenerative disc disease, a condition that preceded Plaintiff's transfer to Livingston, posed to Plaintiff's future health.   Nor do Dr. Abbassey or Dr. Rao aver that they were unaware their failure to request further diagnostic testing to determine the cause of Plaintiff's complaints posed a risk of serious harm, particularly severe pain and degeneration, to Plaintiff.   It is significant that nothing in the record indicates Dr. Abbassey or Dr. Rao ever requested approval of further diagnostic testing, yet were denied.   Rather, the record does support Plaintiff's assertion that Dr. Abbassey and Dr. Rao merely reacted to Plaintiff's requests for medication as assuming Plaintiff was seeking to obtain drugs for use other than as pain relief, despite basic medical knowledge that left untreated, a degenerative disc disease will progress and cause further pain and nerve damage which may not be reversible, a conclusion indisputably confirmed by Dr. Fries's unequivocal diagnosis of Plaintiff's condition, a fact not typical of a prisoner's § 1983 claim alleging failure to treat.

On this record, a reasonable jury could find that Defendants Dr. Abbassey and Dr. Rao acted with deliberate indifference to Plaintiff's serious medical need by failing to order further diagnostic testing to ascertain the cause of Plaintiff's pain, and arm and hand weakness and numbness, and failure to provide appropriate treatment.   Summary

judgment on Plaintiff's claims for relief asserting violations of his Eighth Amendment rights based on an alleged denial of medical care should be DENIED.

**5.      Qualified Immunity**

Alternatively, Defendants argue that so long as it was objectively reasonable for Defendants to believe that their conduct under the circumstances did not violate Plaintiff's constitutional rights, they are qualifiedly immune from liability in this action. Defendants' Memorandum at 15.  Plaintiff has not responded in opposition to this argument.

"A government official is entitled to qualified immunity from suit for actions taken as a government official if (1) the conduct attributed to the official is not prohibited by federal law, constitutional or otherwise; (2) the plaintiff's right not to be subjected to such conduct by the official was not clearly established at the time of the conduct; or (3) the official's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *Cuoco v. Moritsugu*, 222 F.3d 99, 109 (2d Cir. 2000).  Whether a right was clearly established at the time of the challenged conduct depends on settled law, as articulated by the Supreme Court or the Second Circuit.  *Powell v. Schriver*, 175 F.3d 107, 113 (2d Cir. 1999) (considering "[i]n determining whether a particular legal principle was 'clearly established' for purposes of qualified immunity . . . 'whether the decisional law of the Supreme Court and the applicable circuit courts supports its existence . . . .'" (quoting *Horne v. Coughlin*, 155 F.3d 26, 29 (2d Cir. 1988))).

Here, with regard to Plaintiff's Eighth-Amendment failure to provide adequate medical care claims, it was settled when the alleged constitutional violations occurred that a deprivation of medical care resulting in death, degeneration or extreme pain is a sufficiently serious deprivation arising to a constitutional violation provided Defendants acted with a sufficiently culpable state of mind, *i.e.*, Defendants knew of and disregarded "an excessive risk to inmate health or safety. . . ." *Farmer*, 511 U.S. at 834-37.  Further, the same issues of fact precluding summary judgment in favor of Defendants regarding the subjective element of Plaintiff's Eighth Amendment claims likewise precludes summary judgment on qualified immunity.  Accordingly, Defendants are not entitled to qualified immunity on Plaintiff's Eighth Amendment claims.

## CONCLUSION

Based on the foregoing, Defendants' motion seeking summary judgment (Doc. No. 17), should be GRANTED in part and DENIED in part.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      August 6, 2014
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn*,  474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:    August 6, 2014
             Buffalo, New York